This appeal presents the question of whether a certain instrument purporting to be an agreement as to the distribution of the above-named decedent's estate is a contract and, *Page 4 
if it is, whether such contract was made after disclosure by respondent of all matters which appellant should have been cognizant of in order to give her the basis for a reasonable choice of action in accepting the contract. Other questions are presented. We shall consider them as we proceed. The case is full of intricacies which cannot in this opinion be discussed to their last detail. With this introduction, which should point the reader's mind to the main question to be considered, we recite the history and facts.
Appellant, Marie E. Blodgett, and the deceased, at the time of his death on July 27, 1932, had been married approximately thirty-two years. Deceased had been married before when a young man. He had one son by that marriage. Deceased had practically no contact with his former wife or son during his married life with Marie until about 1930, when he began corresponding with his son. He called his son to California in August, 1931, and gave him charge of his business. This son had taken the name of his mother's second husband and went by the name of Charles E. Crosby, hereinafter called Crosby.
Deceased had for many years carried on in California the business of loaning money on automobile paper. In order to obtain for himself a larger return than the permitted interest rate, he organized a company known as Incorporated Motor Owners, hereinafter called the corporation. Outside of the qualifying shares, he was the sole owner of the stock. This corporation evidently acted as broker and obtained for the borrower the money from the deceased, charging a brokerage fee for it, which in turn, of course, came to Blodgett as practically sole owner. Deceased evidently did some business through L.L. Middlecoff personally, who was also manager of the Incorporated Motor Owners until August 15, 1931, when Crosby took hold. Just what were the methods of doing business among Blodgett, who was the financial reservoir, and the Incorporated Motor Owners and the borrower of the money is of only incidental materiality *Page 5 
in that it may throw a sidelight on some of the contentions respecting claims made by the corporation against Blodgett.
Blodgett also organized a personal corporation known as the Blodgett Finance Corporation. It was a holding company for his property, especially his real estate. Blodgett had a hunting lodge on the Bear river in Box Elder county, Utah. In June of 1932 he came to Utah to live in the lodge. It appears from the evidence that he definitely intended to make Utah his home. Judge Jones of California, later in a decree dated August 22, 1932 found this to be the case. He left his wife in Los Angeles in a home he had provided for her. It was a marital separation. On July 26, 1932, he died in his home on the Bear river — The Last Stand Lodge, as he named it. He left a will dated April 20, 1931, the construction of which is collaterally involved in this case. The second paragraph of the will reads:
"Second: All the property owned or possessed by me and my wife, Marie E. Blodgett, except the property mentioned in paragraph third below, is community property of ourselves, and by this Will I am disposing of only my half of the community property and recognize the right of my said wife to her one-half of the community property."
He then confirmed to his wife the household furniture and her purely personal belongings and $10,000 of investments "now in her own name as her separate estate." He further gave her all his purely personal belongings "such as my personal automobiles, my guns, my jewelry, furniture, books and all other personal belongings not used in my business." In the fourth paragraph, which becomes of moment, he directed "that my funeral expenses, expenses of administration in the probate court by my Executors prior to distribution to my Trustees and all my personal debts, as distinguished from business obligations, be paid out of my half of the community property." He appointed as executors and trustees of his estate the following: "Charles Edwin Blodgett [Crosby], A.D. Osborn, Adela S. Oates, Ella Bathrick, Marie E. Blodgett and Coral M. Clark." He appointed Walter W. Middlecoff to act as the attorney for the estate. Mrs. *Page 6 
Clark and Mr. Osborn were legatees; Mrs. Oates was his bookkeeper and the bookkeeper for the corporation.
After his funeral all these executors met in the office of Mr. Irwin, Mr. Crosby's attorney. Mr. W.W. Middlecoff was also present. Mr. Crosby stated he would not have Mr. Middlecoff and the latter said he would represent Mrs. Blodgett as her attorney. At this meeting it was discussed as to whether the will should be filed in California or Utah but no decision was arrived at. Mr. Osborn was to hold the will until this question was determined, Mr. Irwin being compelled to leave Los Angeles for two days. While Irwin was away, Middlecoff prepared a petition signed by Mrs. Blodgett asking for her appointment as special administratrix in Los Angeles county. On this petition, while Irwin was away, the appointment of Mrs. Blodgett as special administratrix was procured. Upon Irwin's return he made representations to the superior court in pursuance of which the court revoked the order appointing Mrs. Blodgett special administratrix. It was thereafter finally agreed among the executors that Mr. Crosby should file Mr. Blodgett's will in Box Elder county, Utah, and apply for his appointment as executor for the estate in Utah and that the remainder of the named executors should institute ancillary probate proceedings in Los Angeles county and apply for their appointment as executors of the estate in California. But, before application for admittance of the will to probate was made in Box Elder county, Lowell L. Middlecoff, before mentioned, as a pretended creditor with W.W. Middlecoff as his attorney, instituted proceedings to compel the probate of the will in California, which proceedings Mrs. Blodgett contested on the ground that the place of Mr. Blodgett's resident at the time of his death was in Utah. Finally, on September 1, 1932, after Mr. Blodgett's will was offered for probate in Box Elder county, Crosby was appointed executor of the estate in Utah. Thereafter, Mrs. Blodgett, with the others named in the will, were appointed as the executors of the estate in California. *Page 7 
The time then seems to have been ripe for the harpies to swoop down on the estate. L.L. Middlecoff, who had, during a dormant period of the Incorporated Motor Owners, loaned out Blodgett's money as broker, put in a claim for $100,000. It was settled for $12,500. Attorney Middlecoff put in his claim for $1,410. The California executors settled for $350. Ella M. Allen presented a claim for services as a Christian Science practitioner alleged to have been rendered over a period of approximately 20 years. It was rejected, but the special administrator, one Herbert Selig, who also seemed to claim a fee for something (his incumbency hereafter explained), in which Middlecoff acted as his attorney, permitted, without notice to Crosby, a judgment for $10,000. This was settled for $2,500. Scott Carter put in a claim for $350 which was settled for $200. Drs. Madsen, Kosky, and Williams put in claim for alleged medical services during 1930 and 1931 aggregating $9,940. This aggregate claim was settled for $3,500.
At L.L. Middlecoff's instigation, Judge Chas. S. Crail of the superior court of California made an order on May 20, 1933, removing all the California executors because they permitted Crosby to take possession of the intangible assets of the estate. Crosby and Mrs. Oates left California with these assets and for sixty days remained in Utah. Upon the removal of the California executors, Selig, with W.W. Middlecoff as his attorney, was appointed special administrator. The California executors filed their account. Selig and L.L. Middlecoff filed objections on the ground that they should include all the assets under the Utah jurisdiction. A change of venue to Judge Benjamin C. Jones was obtained. He tried the issues raised by the objections and on August 22, 1933, approved the account of the executors, dismissed the objections (Middlecoff's having been withdrawn), discharged the California executors appointed by the will, and continued Selig in office. On September 15, 1933, Mr. Oakley was appointed on petition of Mrs. Blodgett and Mr. Crosby as special administrator. *Page 8 
After Judge Jones entered his decree, Crosby returned to California and there prepared, with the assistance of Mrs. Oates, who had been Blodgett's bookkeeper and the bookkeeper for the Utah estate, a statement of all the assets, claims, and accounts purporting to affect the Blodgett estate. This is known as Exhibit K and plays a very important role in the case. Copies of this statement were given to Mrs. Blodgett and her attorney, Mr. Styskal, "about the latter part of September, 1933." The statement was discussed in Mr. Styskal's office by him, Mrs. Blodgett, Crosby, and Crosby's attorney, Irwin, for a considerable time. Other conferences were held in which the various items of this account were discussed between Mrs. Blodgett and Mr. Crosby and their respective attorneys, Styskal and Irwin. Changes were made as objections and compromises were arrived at in regard to the various items. Exhibit K. contains four pages which were annexed to the "Statement by Crosby, Utah Executor," each of which pages is headed "Blodgett Estate — final Corrected Account — Agreed Upon October 3rd, 1933."
On November 7th, Styskal sent by his office assistant, Mr. Barth, certain papers for Mrs. Blodgett to sign, first calling her on the telephone and informing her of the papers being sent. She states the papers were not put together but she read them and "understood it was a distribution of the properties." This document, copy of which is introduced as Exhibit No. 6, and which will in this opinion be so designated, was dated "as of" November 27, 1933. After Mrs. Blodgett signed it, Styskal sent to Irwin a letter in which he states:
"As indicated to you over the telephone, I have obtained the signature of Mrs. Blodgett to the Agreement recently discussed by us, which agreement outlines the rights of Mrs. Blodgett and Mr. Crosby in relation to the distribution of the estate above named.
"There are a few points which have entered into our verbal understanding, which have not been incorporated in the written agreement. I know you wish to avoid rewriting the agreement submitted; hence this letter shall be deemed a supplement to the agreement in so far as the following points are concerned:" *Page 9 
Then follow nine paragraphs giving Styskal's interpretations of several numbered paragraphs of the Addendum to the purported agreement which was marked Exhibit "A" of said agreement (Exhibit No. 6) and which specially set out the items to which Mrs. Blodgett was entitled. Some of these nine paragraphs suggested administrative details for executing the agreement. None of them made any changes in the agreement or any additions. As suggested in the preamble of the letter, they were matters which Styskal and Irwin had talked about regarding interpretations or administrative features. Irwin replied under date of November 14, 1933. His letter in most cases agrees with Styskal's interpretations and in some cases even concedes an interpretation more favorable to Mrs. Blodgett than did the "understandings" set out in Styskal's letter. In one or two matters he suggests minor modifications of Styskal's suggestions considered necessary for proper collection of certain collateral notes. It would expand unnecessarily this opinion to set out even the gist of each of the paragraphs of Mr. Styskal's letter or those of Irwin's in reply. Much point is made that the papers signed by Mrs. Blodgett and exchanged by the two attorney's as duplicate originals did not constitute a contract by Mrs. Blodgett for the reason that Styskal's letter contained conditions which had not been met. Even the court in its findings seemed to think it necessary to hold that Styskal had no authority from Mrs. Blodgett to send such a letter to Irwin, although it found Styskal to be Mrs. Blodgett's attorney.
We find no such difficulty. Both attorneys after the exchange of the letters assumed the contract as signed by Mrs. Blodgett was valid by execution and delivery. The letters themselves show not additions but efforts to give contemporaneous interpretations and suggestions for administering a 1, 2 contract already valid. It is exactly the same as if the duplicate originals of the contract had been exchanged and afterward letters had been exchanged in order to settle on some expressions over which minds might differ. *Page 10 
Moreover, if the proposals for understanding by Styskal are measured with the answers of Irwin, we find a practical agreement on the terms and methods of executing the contract. If all admittedly valid contracts furnished as little for a difference of construction as these two gentlemen found, the courts might rejoice. We are unable, furthermore, to see why Styskal was not representing Mrs. Blodgett in this matter of trying to determine Crosby's viewpoint on this contract contemporaneously or before delivery.
Appellant vigorously asserts that Styskal was representing Selig and his successor Oakley as administrator. So he was, but it must be remembered that all claims had been settled before September 1st, after which Mrs. Blodgett and Crosby had their conferences. There was no question of creditors or of legatees. They had been or by the agreement would be taken care of. Therefore the interests of Mrs. Blodgett and Crosby alone were in dispute. Irwin was representing Crosby in the latter's capacity as executor and also individually. There was no necessary conflict in such relationship because advice as to the care and maintenance of the property and as to careful and prudent administration would serve both Mrs. Blodgett and Crosby, the sole remaining beneficiaries. When they were in conference over the internal matters of the estate, i.e., as to how it should be divided, it was perfectly evident that Irwin was representing Crosby as a beneficiary and Styskal was representing Mrs. Blodgett as a beneficiary. The fact that Styskal represented Oakley as administrator did not mean that he was not also representing Mrs. Blodgett as a beneficiary. The fact that both these attorneys were paid, Irwin two-thirds and Styskal one-third of the total attorney's fees chargeable against the estate, did not change the outstanding fact deducible from the evidence that each attorney while protecting the estate against external assaults and advising careful administration was at the same time representing an individual beneficiary. Nor is this fact affected by the letter of Styskal to Mrs. Blodgett, dated June 28, 1933, in which he states he could not act *Page 11 
for Mrs. Blodgett as her individual attorney because he was under duty to represent the "collective opinion of all the California executors," and that her individual interests might be in conflict with the policy of the other executors. On June 28, 1933, the California executors had already been removed by Judge Crail (May 26, 1933) and Styskal was representing them only in their accounting. On July 6th, Styskal wrote Mr. Irwin, stating that:
"Mrs. Blodgett feels that her position is such that she will best profit by individual counsel. * * * She expressed the desire that I continue as her attorney individually, and therefore I have concluded to resign from my capacity as counsel for the deposed executors, other than Mrs. Blodgett. * * * under the circumstances, it is vitally important that we call the executors together for a meeting at once, that they may be advised of the change."
This meeting was called at which Styskal said he was going to act for Mrs. Blodgett alone. The executors then retained Judge Morrison to represent them. On August 22, 1933, Judge Jones approved and settled the accounts of the executors and discharged them and continued Selig in office. At this time Styskal, according to the decree, was representing Mrs. Blodgett and Morrison represented the rest of the erstwhile California executors. This was before negotiations between Mrs. Blodgett and Crosby began. So the situation mentioned in Styskal's letter of June 28th no longer existed and he was free to represent Mrs. Blodgett, and represent her he did, if evidence is capable of belief. In the conferences between Irwin, Crosby, Mrs. Blodgett, and Styskal, he advised Mrs. Blodgett, and on October 3d, after a last combing over of the various items of Exhibit "K" as affected by the corrected list annexed to the account presented by Crosby, which had been the basis of several discussions, he retired into another room with Mrs. Blodgett and evidently consulted with her about it before she agreed to the "Final Corrected Account." So we entertain no doubt but that Styskal was representing Mrs. Blodgett throughout all these negotiations and was her personal attorney. In fact, during the *Page 12 
testimony she designated him again and again as "my attorney." It was an idea fixed in her mind.
We do not mean to condone as a usual thing the practice of the attorney for the administrator or executor in his capacity as such also representing him in his personal interests against other beneficiaries. But in this case it was apparent that Irwin represented Crosby in his personal capacity as well as in his administrative capacity, and Styskal Mrs. Blodgett in her personal capacity as well as for a short time in her administrative capacity. These facts were known by both sides and no objection was forthcoming.
We see no reason why counsel representing a client should not in the scope of his authority in matters such as this attempt to clarify the clauses to an agreement, and why such attempts at clarification have anything to do with the question of whether or not the document itself sought to be interpreted was a contract. We have dwelt on the matter of Styskal's representation of Mrs. Blodgett because we believe it plays an important part in another question which is as to whether there was concealment by Crosby. We definitely hold that the document, of which Exhibit No. 6 is a copy, was a contract between Mrs. Blodgett and Crosby relating to the distribution of the estate.
Before we consider the remaining questions which are involved, we shall advance the facts to the point of the taking of this appeal. It appears that, after the agreement was executed, Crosby continued to act as executor for the estate in Utah and Oakley for the estate in California. Oakley had, as above stated, succeeded Selig as administrator with the will annexed in California. The former, on December 1, 1934, filed his second and final account and petition for settlement and partial distribution. Mrs. Blodgett entered voluminous objections. The petition for partial distribution contained a copy of the agreement of November 27th (Exhibit No. 6) and asked to have the Utah assets, which by Exhibit "A" of that agreement were to go to Mrs. Blodgett, distributed to her. *Page 13 
The objections of Mrs. Blodgett fall under two heads: (1) That the inventory failed to list certain property belonging to the estate; (2) that certain items for taxes and expense were charged against the whole of the estate, including Mrs. Blodgett's half, which should have been charged under the will against Crosby's half only. The objections set out in detail where it is alleged the account fails to schedule property of the estate. It also alleges that the petition for partial distribution is based on the alleged agreement of November 27, 1933, but that said purported agreement "is not now and never was binding" on account of the "fraud, deceit and misrepresentation of Crosby in inducing petitioner to sign the same." The objections allege a confidential relationship between Mrs. Blodgett and Crosby both before and after decedent's death with Crosby as the superior party. They also allege that the marital domicile of Mrs. Blodgett never changed; that half of the estate belonged to her as community property, was recognized by the will, and never should have been included in the estate in Utah. There were two additions to the objections by way of amendment setting up lack of consideration for the agreement of November 27, 1933; that the "modifications' proposed by Styskal in his letter above mentioned were not concurred in by Irwin and, therefore, there was no meeting of the minds and no contract; also attacking the correctness of certain items in the account and the correctness of charging them against the whole estate rather than against only Crosby's share of the estate; also alleging that the account did not include certain items of principal and interest paid on certain notes by the executor; also charging mismanagement in overpaying employes, etc. The objections also prayed that the agreement dated November 27th be declared null and void.
The accountant Crosby responded to these objections. The petition for distribution, objections, and response form the issues. The court heard the matter at length and made findings and conclusions against the contestant, holding the contract of November 27th was signed by Mrs. Blodgett *Page 14 
"freely and voluntarily" and was therefore valid. In the decree the court stated:
"That Charles E. Crosby has received and made disbursements of the property belonging to the estate of said decedent as set forth in his Second Account and Report and his Amendment thereto, and that the items of his said receipts and disbursements contained in his said Second Account and his said Amendment thereto are in all respects true, accurate and complete."
The respondent (accountant Crosby) claims that the only question before the trial court in this matter was the question of the validity of the contract dated November 27th, and counsel for appellant evidently desired to appeal that matter only. But by the above language the trial court approved Crosby's final account, including all of the disbursements and receipts made and received after that agreement and such expenses of administration were not covered or perhaps governed by the agreement. Some of these were contested but the issues had not been tried. This was because at the time the court intimated from the bench that he would find the agreement between Mrs. Blodgett and Crosby valid, the attorney for the former stated, in reply to a remark by respondent's counsel expressing a desire to close up the estate immediately, that he was "not interested at the present time. We intend to take an appeal of this matter." Some discussion was had as to whether an appeal could be taken until the whole matter of the adjudication was closed. The court expressed doubt but suggested an agreement which would close the litigation and leave the undecided contested matters for future settlement, to which counsel for appellant answered, "Isn't it true that an appeal can be taken from any special proceeding in a probate matter?" The court again expressed its doubt, whereupon the attorney for appellant stated, "We will consider the matter further."
The court, in order to run no risk of the appeal being dismissed because it was not from a final judgment, decreed in the language above set out, which purports to adjudicate *Page 15 
items still remaining to be heard. We shall make proper provision for the hearing of these contested matters, wherein counsel have not yet been heard by the court, at the conclusion of this opinion.
This brings us directly to the question of whether the agreement of November 27th should be set aside because of alleged concealment. Preliminary thereto, it is necessary to dispose of a question raised by counsel for appellant. They contend that Mrs. Blodgett and Crosby were in law in a relation of confidence; that on Crosby, the superior in that relationship, rests the burden of proving at least a prima facie case that he had not concealed information he was duty bound to disclose nor suppressed property belonging to the estate. It is claimed the court erred in requiring appellant to carry this burden. Respondent counters by contending that all the court did was to require appellant to carry the burden of going forward and not the burden of proof further, that this was not an agreement between executor and heir by which the executor sought to procure property admittedly that of the heir (which might in law be presumed fraudulent), but that it was a family settlement — not only upheld but favored in the law because Crosby and Mrs. Blodgett were not agreeing as executor and heir but as beneficiary and beneficiary; furthermore, that no actual relation of confidence existed because Mrs. Blodgett was distrustful of Crosby, had her own attorney, relied on him and not on Crosby, and that therefore she cannot urge the doctrine of duty of one in whom confidence is actually reposed and accepted by him nor contend that in law the confidential relationship existed. We fear much confusion and ambiguity may result if we take refuge behind such phrases as "Confidential Relationship" and "Family Settlement." We shall pierce the veil of terms and look at the actual facts.
Mrs. Blodgett was a beneficiary or, perhaps to put it in a form to better suit appellant's counsel, she had an interest in the estate. Likewise did Crosby. Crosby was also the administrator or manager of the estate in Utah. As administrator *Page 16 
he had the duty to make full disclosure of all matters and information regarding the estate. It is not unlike 3 a partnership where one partner manages the business. He must make full disclosure of his acts and the state of the business and render a correct accounting. But being the superior party in such case does not mean that he is under obligation to advise his partner in matters affecting a conflict of interests between themselves. As to external affairs of the estate, yes, but there is no obligation on the part of one heir who is an administrator to either give advice or wisdom to a coheir in matters where there is a conflict or a controversy as to the extent or nature of their respective rights. His duty as administrator went to the obligation to take into possession and disclose all estate property and all information to those interested in the estate as to estate matters, thus putting them on the same plane as he was as to such information regarding all the assets and transactions, but, when that is done, he has performed his duty to a party in regard to whom he is in controversy as to their respective interests. In that relationship, after they are on an even plane as to all estate matters, she must exercise the decisions as to whether she will stand firm or recede in the controversy between them as to differences of opinion regarding their rights. Counsel for appellant blithely state that there was no room for differences — the will was perfectly plain as to what should be charged against her and against his interests. Plain in words, but like the law at times not so clear when the words were to be applied.
There was to be charged against the estate not belonging to her expenses of administration in the probate court. Did it mean all expenditures required to be made by the administrator, such as inheritance taxes, income taxes, fixing and repairing property, expense of litigation which was plentiful in this estate in order to defend it against onslaughts, or did it mean only the usual expenses in the probate court? Certainly, there was room for difference of opinion there. We do not have to decide on the meaning of these words. All *Page 17 
we need do is to determine if there were reasonable grounds for controversy and, if so, whether he furnished her full information as executor from which she could decide in their controversy as beneficiaries what she would or would not do. When he did this and she was fully informed and acted not on his advice which he was not required to give, but on her own judgment and on that of her attorney Styskal, he had no responsibility for her decisions. And in the matter of property claimed to have belonged to the estate which he claimed, there appears to be, from the record, a very substantial ground for difference of opinion. It was not simple. Even on reading the record, we find these transactions which took place before Blodgett's death shrouded in doubt and difficult to follow. We hardly think disclosure means admitting that something you think is yours belongs to the estate. Certainly, Mrs. Blodgett had disclosed to her before she signed the agreement all the facts upon which she now founds her claim that Crosby was in possession of $42,700 in assets which should have gone to the estate.
We have attempted to draw the line of his duties. We do not need to indulge in phrases or applications of doctrines. Nor do we need to cite cases. The law is plain that he has his duty as trustee to her and as such it must be fully performed. But, once performed, it does not extend into a field 4 where trusteeship stops and adverse interest begins. This is not the case of an administrator attempting to gain from his cestui an advantage which he knows she is giving up. The cases where a trustee, executor, administrator, or partner in a superior position buys or procures from his cestui property of the latter by reason of his position are not applicable to this case. We are, therefore, confronted with the inquiry, Did Crosby place before Mrs. Blodgett and her advisor, Styskal, all the facts regarding the charges against the estate and did she know of the facts about the transactions which allegedly placed in his hands assets which she claims belong to the estate worth $42,700? From the record it appears that she knew substantially as *Page 18 
much about these matters by November 7, 1933, as she did later. The court held that Crosby had the duty to prove his account. He proves part of it by advancing the agreement as a basis of distribution. He is confronted with the claim that the agreement is invalid because it was not made upon full disclosures. Appellant contended that, the moment it was contended that the agreement was invalid for such reason, there devolved on Crosby the duty to show that full disclosures had been made. Perhaps so, but we would not reverse a case where the proof, regardless of who or what order it was put in, showed that it fully substantiated the trial court's findings that there was full disclosure unless it could be shown that substantial prejudice resulted thereby. We will, therefore, at this juncture make the inquiry as to whether there was disclosure by Crosby of all the matters over which apparent agreement was had by the agreement dated November 27th. The matters are numerous and intricate. They divide themselves, as before indicated, into two great classes: (a) Assets claimed to belong to the estate in the hands of Crosby and claimed by him; (b) expenses and charges made against the whole estate which should have been made only against his interest, and/or that charges against her interest were exorbitant.
The first group subdivides itself into three sums of $20,000, $5,000, and $10,000, claimed to have been withdrawn by Crosby respectively on June 14, 23, and 29, 1933, during the life of his father and while he was in charge of his affairs. The fourth item is $7,790 which it is claimed was on the 5 books of Blodgett as a charge against Crosby; a fifth item, known as the Glendale property; and a sixth item, the capital stock of the Incorporated Motor Owners, which Crosby claimed.
We shall consider these items briefly, hoping to avoid a too minute recitation of the ramifications into which the evidence takes us. The first two checks, aggregating $25,000, were paid to Mr. Crosby. This money went into Incorporated Motor Owners. The only testimony regarding the reason *Page 19 
for this transaction comes from Mrs. Oates, bookkeeper for the corporation and for Mr. Blodgett personally. She says the corporation was insolvent; that she was instructed before Blodgett left for Utah to draw $25,000 from Blodgett's capital account to Mr. Crosby's order and charge it to his capital account as a "contribution to surplus" of the corporation. The corporation owed Blodgett $22,000. When Crosby turned the $25,000 over to the corporation, it paid Blodgett back $22,000. It was, therefore, in a sense, a payment from Blodgett to Blodgett of $22,000. Blodgett had owned the entire capital stock of the corporation outside of qualifying shares. He therefore took from the corporation in the form of profits what it charged the borrower for guarantee and brokerage. If he took too much and it was insolvent, he simply restored money to make it solvent, in order, as it appears, to meet certain requirements of the Corporation Commission of California and in order that it might carry on business in a different way, for he writes his son on May 15, 1932, "We are going to revolutionize that auto loan stuff and put it on a paying respectable basis." But it is said that it was, in effect, a gift to Crosby because Crosby himself owned the stock, it having been conveyed to him for a consideration of $1. One of the questions between Mrs. Blodgett and Mr. Crosby was as to who really did own the stock of Incorporated Motor Owners before Blodgett's death. Blodgett had the stock first in the name of Mrs. Oates' husband. Oates indorsed the certificate back to Blodgett. Just before June 1st, he told Mrs. Oates that he had sold it to Crosby for $1 and to convey it to him. Later he kept writing his son about the stock. Before his death, Crosby indorsed his stock certificate back to Blodgett and sent it to him. Before his death, he handed it to Mrs. Blodgett and it was in her possession at his death. There is evidence that Blodgett gave his wife the stock as her stock. It is quite likely that the stock may have been given to Crosby as it was to Oates with the idea of having legal title only in Crosby's hands. Both sides make their claims in respect to the *Page 20 
ownership of this stock. But the question before us is not who owned the stock but was Mrs. Blodgett deceived? She was not deceived as to who owned the stock. She had it and claimed it. She knew about the two payments aggregating $25,000. At a meeting of August 13, 1932, of herself, Styskal, Crosby, and Mrs. Oates, the items were called to her attention and discussed. A complete transcript of Blodgett's capital account was made and given to her or Styskal. And on September 1st she signed an agreement in which she acknowledged that she had no interest in said stock but that Crosby was the sole owner thereof. It is claimed that this agreement could not have been made on full disclosure because it is "unconceivable to believe that she gave up this Incorporated Motor Stock, worth approximately $53,000 for the sum of $4,729.25 [which was the consideration named in the agreement] (payable to herself out of her own funds) with a full understanding of all the facts including a knowledge that Mr. Blodgett had contributed $25,000 in cash to its capital or surplus immediately before his death." But this contract of September 1st is not under attack. Appellant's counsel stated in the trial that it was not under attack. Moreover, the statement by appellant that the corporation was worth over $53,000 on September 1, 1933, is subject to very great doubt. Appellant states that it had on that date $10,117.51 "less than enough to make up its capital," and, since its capital was $25,000, subtracts this amount and finds a net value of stock of approximately $15,000. To this he adds the $25,000 "contribution to capital" and a claim of $13,645.81 which the corporation asserted against the Blodgett estate for collecting notes, which was under the conferences between Mrs. Blodgett and Crosby cut to $8,289.25. But the $10,117.51 is a "surplus" contained in the trial balance sheet on May 31st; also June 30th. How it was arrived at and whether it existed except as an item for balancing accounts carried over from a past period does not appear. Certainly, the trial balance of May shows expenses of $36,456.57 against assets of $24,230.38. It shows *Page 21 
in addition $22,000 owing to Blodget which may be offset by about $22,000 in income. The company appeared insolvent, which is why it is claimed Blodgett contributed $25,000 to put it on its feet. We do not know the condition of the company around September 1, 1933. It may be that it was not worth so much more than $9,558.50 net, which was twice the amount which Mrs. Blodgett received and which, had the estate owned the stock, would have been her share. Furthermore, she received an increase in monthly family allowance by the agreement, the confirming to her of a Cadillac automobile in regard to which a dispute arose as to whether it was business property or his "personal automobile." The statement included in the parentheses by counsel in the above quotation that the $4,729.25 was payable out of her own funds is incorrect. Exhibit K shows this item to have been added to Mrs. Blodgett's one-half of the net with other items to show the full amounts paid to her. It is not included in the $77,727.64 which is deducted from the gross estate in order to obtain the base net to be divided. Cases are not strengthened by attempting to make things appear dark against an adverse party where much of the dark is dispelled by admission of light. Appellant complains of the complicated nature of Exhibit K and states that it was for the purpose of misleading Mrs. Blodgett. We do not find it complicated nor do we think Mrs. Blodgett's attorney, Mr. Styskal, did.
While Crosby was under duty to disclose the true state of affairs, he was not under duty to disclose them differently than he honestly thought them or to disclose them to suit appellant's version of the situation. Counsel seem to argue that, because Crosby did not put interpretations on the will and on transactions which were in accord with Mrs. Blodgett's after-conceived notions, he was failing to disclose the true facts, and for sinister reasons. It is furthermore claimed that, since Mrs. Blodgett did not understand the information given, he failed to disclose it. We think that much of what she complains of is not due to a failure to disclose *Page 22 
but due to her failure to even yet understand what her attorney understood plus a suspicion that Crosby was "doing her."
There may have been some reason for complaint in regard to the claim of the Incorporated Motor Owners for $13,645.81 and some other items which we shall later consider, but as to whether their nature was not fully disclosed and a settlement arrived at after objection is another matter. We do find at this juncture that two withdrawals of $20,000 and $5,000 and the matter of the ownership of the stock of the Incorporated Motor Owners were before all parties and agreed upon. Some of the evidence which would have made these matters clearer was rejected because of the rule that no testimony regarding transactions equally within the knowledge of Blodgett and Crosby could be given. We fail to see any likelihood that, if the whole matter were gone into in court, a different conclusion would be arrived at in regard to them. As to the other item of $10,000 which Mrs. Oates testifies Blodgett told her to pay to Crosby, we must again rely on the testimony of her and Crosby. It is part of a series of transactions which also involves the item of $7,790.00 spoken of above as the Thornton Escrow but which in reality originally seems to have been money paid by Blodgett to complete the purchase price of Crosby's home in Glendale.
We must go back in the history of the transactions between Blodgett and Crosby in order to give the background for Crosby's explanation of these items of $7,790 and the $10,000 paid to him at Blodgett's instructions. Crosby at the time of Blodgett's death and some time prior was managing Blodgett's personal estate and receiving $800 a month salary. Blodgett, as before stated, was practically the sole owner of a personal holding corporation known as the Blodgett Finance Corporation. This corporation held real estate. Blodgett desired to divest it of the real estate. He therefore delivered to Crosby $25,000 and the latter purchased all this realty from the Blodgett Finance Corporation with the *Page 23 
$25,000 in his name. Mrs. Blodgett, vice-president of the Blodgett Finance Corporation, acted as chairman of the directors' meeting wherein the said corporation sold its realty for $25,000. We have no evidence as to the real value of this real estate. These pieces of real estate obtained by Crosby from the Blodgett Finance Corporation were deeded to Blodgett, but the deeds unrecorded until after his death when Mrs. Blodgett found them in an envelope with instructions to record them after his death. But, while these unrecorded deeds were in Blodgett's possession, Crosby, according to his testimony, after consultation and advice of Blodgett, traded the property in for other real estate. The real estate received in this trade included an apartment house which is part of the California estate, the Colgate house, which was given by Blodgett to Mrs. Blodgett as her home before he left for Utah, and the Glendale home, which was in Crosby's name at Blodgett's death. It is testified by Crosby that the deeds to Blodgett of the property received from the Blodgett Finance Corporation were in effect mortgages from Crosby to Blodgett and that the deeds should never have been recorded. Mrs. Oates testified that on August 13, 1933, she went over Mr. Blodgett's trial balance of June, 1932, with Mrs. Blodgett, Styskal, and Mr. Crosby and told Mrs. Blodgett that the $7,790.00 item was not an asset of the estate "because it had been fully settled before Mr. Blodgett left." She also testified that, before Blodgett left for Utah, he and Crosby were closeted in the latter's office for some time and that when Blodgett came out he told her (Mrs. Oates) that they had had a settlement and to draw a check in Crosby's favor for $10,000.
It also appeared that, after the deeds to the property purchased by Crosby from the Blodgett Finance Corporation were recorded by Mrs. Blodgett, Crosby was concerned about suits which might be brought against him because of clouds on the titles to the same properties delivered in the trades. He and his wife brought an action against all of the executors of the Blodgett estate to have it declared that the deeds *Page 24 
from Crosby to Blodgett were in fact mortgages and the same were satisfied by Crosby. Mrs. Blodgett was a witness in that suit and testified that she had admitted in answer to a question of Judge Packer Wood that the deeds were mortgages and the latter had been satisfied. She afterward joined with the then California executors in signing a satisfaction of mortgage for the estate in these properties.
While we think the transactions regarding this "loan" of $25,000 to Crosby, his using it to purchase the real estate of the Blodgett Finance Corporation, and then giving deeds to Blodgett, then, while those were outstanding, trading it for other real estate, leaving the deeds with Blodgett and coming out apparently with his Glendale property, with the $7,790 put in by Blodgett apparently satisfied and $10,000 extra, are somewhat shrouded in mystery, it appears from the record that Mrs. Blodgett knew of all these transactions as fully by October 3, 1933, as she does now. It may be that, if the law had not closed Crosby's mouth because of the death of Blodgett, it could be satisfactorily explained. It is also pointed out by counsel for the respondent that the decree of Judge Wood specifies that the mortgages (nominally deeds to Blodgett) were satisfied. We therefore must conclude that, unless we are to force Crosby to make a disclosure which would accord with appellant's theory that he did not satisfy these mortgages to Blodgett, which would be contrary to all that he maintains, we must hold that he did disclose what the facts were, or at least what he claimed the facts were, and Mrs. Blodgett and her attorney were in receipt of them when she signed the contract of November 27, 1933. This concludes our analysis of whether Crosby made proper disclosure as regards the items which it claimed should be part of the estate.
We now take up subdivision (b) above mentioned, viz., the matter of whether certain items charged against the whole estate in a total of $77,727.64 were explained to Mrs. Blodgett and her attorney so that her settlement was on full information. It must be kept in mind that we are not *Page 25 
passing now on the correctness of these items nor on the question of whether under a proper construction of the will they were chargeable, but only on the question of disclosure.
The first main item is business claims amounting to $22,556.56. This is broken down into a number of subsidiary items, the main one, which is seriously questioned, being a claim of $11,124.32 by the Incorporated Motor Owners for liquidating expenses of L.L. Middlecoff notes incurred prior to death, including the expenses of printing the "Blodgett Booklet." But in the adjustments, apparently after considerable discussion with Styskal, the widow was charged with only $837.62 of this claim. Not only was there disclosure as to this item, but a reading of the testimony as to how the $11,124.32 was arrived at as a claimed business deduction gives one the impression that Crosby made some very marked concessions which in justice he could have resisted. Complaint is made that an item of $10,313.30, which was the amount of principal and interest owing Mrs. Blodgett and spoken of in the will, was a personal and not a business debt and should come from Crosby's half entirely. Although the note was from Blodgett personally, it sufficiently appears that it was a business debt, the money going into the business. Moreover, it appears to have been discussed in the conferences between the parties and that result arrived at by the parties. Several of the smaller items in the total of $22,556.56 are in the same category.
The next classification of claimed unjust deductions from the total estate which results in Mrs. Blodgett paying from her share a half is for "Care, Management and Maintenance of the Estate," which originally amounted to $18,934.31. This included one large item of $13,434.09. It was a claim of the Incorporated Motor Owners against the estate for alleged services for collection of notes. After Blodgett's death, the estate turned over $110,000 in notes to the Incorporated Motor Owners, using the latter as a collection agency. There was a contract between Blodgett and the Incorporated Motor Owners, dated June 1, 1932, in which it was agreed that the *Page 26 
Incorporated Motor Owners should bear the costs of collections. It is not clear to us why in the face of this contract the Incorporated Motor Owners should put in a claim for $13,454.09 for collections. Evidently the contract was considered terminated on Blodgett's death, which may have been the case and after that the Incorporated Motor Owners only acted as agent to collect the estate notes. But this item appears to have been discussed at the conferences above mentioned and objected to. Objection was also made to various other items charged for care and maintenance. The upshot was that Exhibit `K', corrected account, shows deduction of $6,582.12 from the $18,934.31, leaving $12,352.19 chargeable against the gross estate, one-half of which Mrs. Blodgett would then assume. Of course, this deduction includes $5,164.64 made in the item of $13,454.09 above mentioned. It is contended by appellant, as it is with the tax claims and expenses of removing executors, which we shall in a moment consider, that these claims for care and maintenance were expenses of administration in probate. Respondent contends they are not expenses in probate, but charges for administration. Respondent shows that, if the full taxes, all these charges of administration expenses of proceedings to remove executors, and the business claims were charged against his half, as contended for by Mrs. Blodgett, it would more than consume his part of the estate. As stated earlier in this opinion, we think, to put it least strongly for respondent, that there was a grave doubt as to whether the testator intended these charges, including those to maintain and repair buildings, salaries of bookkeepers and accountants during administration, should be classed as expenses of administration in probate court. There being an honest doubt, it was a proper subject for compromise. While there may be differences of opinion as to whether some of these items listed under "Care, Management and Maintenance" should not have been listed under expenses in probate court, we shall not now do what Irwin and Styskal, each representing respectively Crosby *Page 27 
and Mrs. Blodget, did for us in their conferences. They considered the segregation of these items, and after objection and discussion subtracted from the sum for care and maintenance $6,582.12 (or $6,642.19). Such parleys between the parties and their representatives should be encouraged and the results after disclosure, discussion, and agreement upheld. We think this is a typical case illustrating such need. We do not see any over-reaching or unfairness in presenting these matters by Crosby. Perhaps Mrs. Blodgett did not understand; few women would and most men would not. But she had a skilled attorney representing her. If he did not understand, it was not Mr. Crosby's fault. Any lack of understanding cannot be imparted to any fraud or suppression on his part.
We might go through in the same way as we have above in regard to the items constituting the total charged for the expenses of proceedings to remove executors, etc., an event which was recited in the statement of facts and as to all the items, but we would be compelled to come to the same conclusion; that is, that all these items were before Mrs. Blodgett and Styskal for discussion in their conferences ending on October 3, 1933, and were agreed to by all parties.
If the items settled by the agreement of November 27th had come to us on an appeal from an order settling them for the first time, we doubt if we could upset the order of the lower court except perhaps in the case of some minor items. We would measure with greater nicety than we now have these items said to be for care, management, and maintenance as 6 distinguished from those constituting expenses in the probate court. We might hope for a little more light in the transaction involving the $25,000 loan to Crosby to purchase the real estate from the Blodgett Finance Corporation, although we fail to see how we could get any evidence other than is in the record and we might want to understand better why the $13,454.09 was charged for services of collection by the Incorporated Motor Owners. But, with the agreement of November 27th coming *Page 28 
between us and the appellant, we are convinced we can only go into the question of whether there was a disclosure and a knowledge of the nature of Crosby's claims and perhaps the fairness of this settlement. Under the evidence which we have reviewed with some care and the results of which only are stated in this opinion, we are unable to say that there was any breach of Crosby's duty to disclose, or any unfairness in the settlement, or that it was made without Mrs. Blodgett being by her representation familiar with all the items in issue.
Nor do we think the contract against public policy because it bound appellant to agree to and concur in all accounts rendered by the executor regardless of their propriety, accuracy, or validity, as is concluded by appellant. The agreement can only cover the items on which it is based, which are with several minor changes reflected in the amended and 7 corrected Exhibit K. Respondent does not contend that it prevents objections to estate expenditures since the agreement was signed or not covered thereby. All such settlements imply that the parties thereto are bound by their provisions as to matters actually settled thereby. The provision in the seventh paragraph of the agreement that appellant should "promptly concur in and approve all the accounts, petitions and/or reports which shall be hereafter filed by Second Party in the Utah Courts," goes only to those matters settled by the agreement including the distribution between Crosby and Mrs. Blodgett.
Respondent makes the further defense that the agreement dated November 27th was ratified by appellant. It appears that on February 20, 1934, Mrs. Blodgett accepted and receipted for $50,000 of Liberty bonds and other securities and cash delivered to her by Crosby, the receipt among other things stating, "pursuant to the agreement executed between 8 Marie E. Blodgett and Charles E. Crosby, dated Nov. 27th, 1933." The receipt refers to the delivery of the Liberty bonds being pursuant to items 12 and 15 of the agreement and the Trans-America *Page 29 
stock being delivered in accordance with items thirteen and fourteen. Mrs. Blodgett sold the Liberty bonds and bought herself an annuity. Appellant contends she took it as a part of the distribution under the will and did not have before her the contract. Counsel for her states that the inclusion of the quoted phrase in the receipt was a shrewd trick to attempt to build up a ratification. We dare say that if it had been omitted counsel would and might well ask, "Why did not the receipt show that it was made in pursuance of the alleged contract?" Where acts may be explained on the theory of an exercise of care and precision, nothing is gained by attributing them to evil motives. Certainly, if Irwin who drew the receipt had nothing else in mind than that there was an agreement, he would naturally refer to it in the receipt. We agree with the lower court that it is difficult to conclude otherwise than that on February 20, 1934, Mrs. Blodgett was acting on the theory that the distribution was in execution of a settlement she had made. Her testimony that she never realized that she was supposed to have made an agreement until informed by Monroe in April, 1934, that her family allowance was no longer to be paid on account of the agreement, is hardly credible.
Appellant contends there was no adequate consideration for the agreement. We cannot agree with appellant that the provisions of the will were so clear as to present no difficulties or differences in the application of them to the facts and 9 that therefore there were no disputes of fact or law to be settled. We think otherwise. There was consideration for the agreement.
Appellant complains of the admission by the court of letters written by Blodgett to Crosby prior to his death, many of them prior to Crosby's coming to Los Angeles. On the strict question of whether there were disclosures or whether the agreement was fair, we find no relevancy. Soon after Blodgett's death, Mrs. Blodgett with her attorney, Middlecoff, visited Crosby. During the conversation about the assets of the estate, Middlecoff suddenly shot at Crosby *Page 30 
the question as to what the latter had done with the money he had "stolen or run away with." After a rather unpleasant exchange of words, Mrs. Blodgett produced a letter received from Mr. Blodgett shortly before his death which in part read as follows: "Matters have developed in our affairs which are being shrewdly concealed that have worried me aggravating my illness. If I had checked out, well there would only been one Big Boss. I am trying to rally enough to undo all this stuff pulled in June."
Crosby produced in answer to this a letter from Dr. Pearce of Utah and read it. He also during the conversation read extracts from the letters complained of. It is on the theory that these letters became part of the conversation that respondent justifies their admission. The parts read as part of the conversations would be admissible if the conversation 10-12 itself was material, but not the parts which did not form a part of the conversation. However, in a case such as this, where it is necessary to show the court considerable background, technical niceties in such matters need not be followed. Certainly, the conversation between Crosby and Mrs. Blodgett and Middlecoff, together with the parts of the letters read, refutes the contention of appellant that she trusted and put confidence in Crosby. She evidently was apprised of the fact that he had received certain sums from Mr. Blodgett. At all events the admission of these letters was so inconsequential as compared to the larger questions in this case that error, if any, in admitting them is not prejudicial. We have frequently held that, where there is substantial competent evidence before a court sitting without a jury, it will be presumed that the court ignored the incompetent evidence. The rule is subject to modifications not necessary to be discussed, but this is an occasion for the rule if the letters were not material.
One more question remains to be disposed of. It is contended that the court should not have signed findings and conclusions and decree not previously served on adverse *Page 31 
counsel. So it should not, but no prejudice resulted thereby. Except the paragraph in the decree heretofore mentioned holding "that the items of his receipts and disbursements contained in his Second Account and his said Amendment 13, 14 thereto are in all respects true, accurate and complete," and except in so far as the sum of $33,683.98, as being the sum Mrs. Blodgett is entitled to under item 14 of the agreement, may be affected by the findings on items contested but not yet tried, the findings, conclusions, and decree were in good form. We will modify, but not reverse, the judgment for this reason.
It is complained that the court made no findings on the issue as to whether the agreement was against public policy or in reference to the issue of consideration. A 15 finding favorable to respondent as to these matters is necessarily inferred.
The judgment of the court finding the agreement dated November 27, 1933, valid, is affirmed. The judgment must be modified so as to leave open for adjudication those items in the account contested but not tried and not covered by the agreement. The court, in order that there might be no question of the judgment being final, provided for the deduction of "one-half of all inheritance, estate, income and/or other taxes and expenses which said Crosby shall have paid in accordance with paragraph six of said agreement." The parties agree that the only question before us is the validity of the contract of November 27th. All items fixed in amount by that agreement must stand. Likewise, classifications fixed by that agreement must stand. But items of taxes and expenses not fixed by said agreement and which appellant desires to question as to amount or classification must be considered open for contest.
We recognize the desirability of a quick settlement of this estate in order to prevent all that Mr. Blodgett built up over the years from being wasted in litigation, but, since an appeal was taken before all matters raised by the objections *Page 32 
were heard, even though the judgment is final in form and purports to settle all these matters, the appellant 16 must have opportunity to be heard on those items not fixed by the agreement but included in the account and to which objections were made. But, since appellant did not wait to have such items tried but stated her intention to take an appeal from the ruling of the court finding the contract valid, and since respondent prevails on that issue, which is the only issue presented in the appeal, costs are granted to respondent.
FOLLAND, C.J., and HANSON, MOFFAT, and LARSON, JJ., concur.