CALLISTER, J., concurs in the views expressed in the opinion of HENRIOD, C. J.

393 P.2d 477

**Vera T. CALLISTER, Plaintiff and Respondent,**

v.

**Lucy C. CALLISTER, Individually and as Executrix of the Estate of Alfred Cyril Callister, Deceased, Defendant and Appellant.**

**No. 10013.**

Supreme Court of Utah.

June 26, 1964.

---

4. 44 Am.Jur. 138, Quo Warranto, Sec. 69.

Fabian & Clendenin, Bryce E. Roe, Salt Lake City, for appellant.

Brayton, Lowe & Hurley, James W. Beless, Jr., Salt Lake City, for respondent.

WAHLQUIST, District Judge:

The appellant appeals from an order granting a motion setting aside a judgment that was in conformity with a prior stipulation of the appellant and respondent here. The action of the court below is affirmed.

In the statement of facts below the appellant is referred to as Lucy and the respondent as Vera. This convenience has been used by both counsel in briefs and in argument.

Doctor Alfred Cyril Callister and Vera had been husband and wife, but were divorced. In the divorce decree the Doctor was ordered to pay certain child support and alimony. Soon after the divorce the Doctor married Lucy. All concerned concede that ill will exists between Vera and Lucy. For a time the Doctor paid as ordered in the decree, but by the time of his death there had accrued an apparent deficiency of $11,150 plus interest.

Lucy applied for and became the executrix of the Doctor's estate. She, pursuant to our statutes and in common law, qualified and undertook to act as an officer of the court in this capacity. In due time she filed an inventory reporting assets of about $800 and claims against the estate of $15,-000, about $12,000 of which was Vera's claim for alleged delinquent alimony, plus interest. Lucy approved and paid, with the estate's $800 and other funds, all claims except Vera's.

In the inventory Lucy showed fairly recent gifts to herself from her late husband of stock of a value in excess of $90,000. Lucy also disclosed a large amount of jointly-held real estate. Vera filed suit. Vera hoped to reach the stock to satisfy her claim. She alleged that Doctor Callister had transferred the stock to Lucy for the purpose of hindering or defeating the collection of alimony. Vera's suit involves Lucy both as the executrix of her late husband's estate and as an individual alleging to be withholding funds reachable by the creditors of the estate. Lucy's pleadings directly denied Vera's allegation. Vera's attorney then took Lucy's deposition, part of which is set out below:

"Q. (By Mr. Beless) Why were the transfers of the stock made in 1959 from your husband to you?

"A. I didn't know they were made until after they had been made and my husband told me he thought it was best to put them in my name.

"Q. When did you find out they had been made?

"A. I don't think it was until in 1960 sometime.

"Q. Did the dividends come in your name?

"A. Yes, they did."

Vera's attorney, apparently satisfied further questioning would be empty, let the matter rest with these answers.

Demand for trial was filed and the case came before Judge Ellett at pretrial. The question was raised as to whether Vera's attorney had any direct evidence of the Doctor's intention at the time of the gift of the stock to Lucy. Vera's attorney conceded they had no direct evidence of the Doctor's intention but would rely on circumstances showing:

1. The Doctor exhibited ill will towards Vera;

2. That at the time of the gifts the Doctor's alimony payments were grossly less than that required by the decree of divorce; and

3. The gifts were without consideration.

Judge Ellett pointed out that even conceding these circumstances were proved there was still a difficulty present in that the Doctor retained, at the time of the gifts and until his death, a share in jointly-owned real property of a value far in excess of any sum due Vera. Judge Ellett indicated this fact weakened Vera's position in that the making of the gifts did not render Doctor Callister insolvent (though it may have made a forced collection of support and alimony from him most cumbersome).

Vera's counsel was impressed, and he immediately attempted to compromise the

dispute. He wrote Lucy's counsel a letter pointing out that the tax authorities may well claim all of Doctor Callister's gifts to Lucy were gifts in contemplation of death and taxable as a part of the estate. He further suggested that Lucy impress the tax authorities by paying moneys to Vera in settlement of Vera's claim. This would emphasize the alleged fact that the gifts were motivated by a desire to defeat a creditor, and very real, and not a fiction or testamentary in character.[1] The claims against the Doctor's estate and Lucy in person were then satisfied by a payment from Lucy to Vera of $4,000.00.

All the time the above dispute was taking place, Lucy's attorneys were requesting and securing additional time in which to settle the estate tax problem, but now this problem was acted on. Lucy filed with the tax authorities some affidavits of Dr. Callister's former attorneys indicating that Doctor Callister was dissatisfied with the terms of the divorce decree. Lucy also filed an affidavit in part as follows:

"LUCY CALLISTER, after being placed on oath, disposes and says:

"That she is the widow of Doctor A. Cyril Callister, who died on the 9th day of February, 1961.

"That during the period of time from March through November of 1959, Dr. Callister transferred certain stocks from his name to the deponent's name which stocks were listed on the inheritance tax report and appraisement under title 'Transfers made within three years of date of death';

"That her husband told her that the transfers were made for the purpose of removing these stocks from his name and placing them beyond access of his former wife, Vera Callister, to whom the doctor owed certain monies for arrearages in an alimony judgment which she had against him;

"That the doctor was very bitter about having to pay this alimony because he felt that his former wife had received

1. "I have done a little figuring on death taxes in A. C. Callister's estate, using the $202,000 taxable estate for both the Federal Estate Tax and the State Inheritance Tax. You might have Ralph Miller check me out on these.

"With the stocks included in the $202,000 as gifts in contemplation of death, and using the full marital deduction, I compute a Federal Tax of $15,100. Likewise in computing the State Inheritance Tax, with $40,000 deduction for the joint tenancy property, I compute a tax of $9,250. Thus, total death taxes of $24,350.00.

"If the stocks are *not* included in the taxable estate, the Federal taxable estate would be $105,000, and there would be no Federal Estate Tax, using the marital deduction. The State Inheritance Tax would be $1,250.00.

"The savings in death taxes, if the stocks are not included as gifts in contemplation of death, this amounts to $23,100. It would appear to me that Mrs. Lucy Callister should seriously consider this tax saving, as she would save the difference between what she would pay Vera Callister and $23,100.00."

more than her fair share of the property upon their divorce; * * *."

The tax authorities presented the matter to an attorney to investigate. This attorney showed Lucy's affidavit to Vera's attorney with an inquiry as to why Vera had settled her claim when Lucy's affidavit concedes the purpose of the "gift" was to hinder or defeat Vera's claim. After a brief period of time Lucy's attorneys stipulated a compromise with the tax authorities.

Vera's attorney later filed a suit and made motions alleging that Lucy had breached her duty as a fiduciary. This matter also came before Judge Ellett, who, on the basis of these motions, entered the following orders:

"* * * Lucy Callister as administratrix of the estate of Cyril Callister had a duty to marshal the assets and to recover all property transferred in fraud of creditors; that this duty as a court officer came ahead of any right that she might have had as an heir or as a transferee; that it appears she had a conflict of interest at the time; that since she was in possession of information that would have tended to have brought assets in the estate and by failing to resign, she has placed creditors in a position that they would not have been in if she had been attempting to marshal all the assets that could come into the estate; and that it appears to the court that this plaintiff in making the settlement did so without full knowledge of all of the information possessed by the administratrix at the time of the settlement."

The judge set aside the settlement and ordered Vera to pay the $4,000.00 (plus interest) she had received in settlement into court and ordered the original action reinstated.

■■■ It is fundamental that the court may supervise its officers.[2] If courts are to enjoy the public confidence the probate judge must be allowed some discretion in supervising his officers. The executrix of an estate is an officer of the court, acting as a fiduciary.[3]

2. See 33 C.J.S. Executors and Administrators § 147, p. 1105.
3. See Bancroft's Probate Practice, 2nd Ed. Pars. 332, 337. "Once appointed and acting, the representative becomes as to the heirs and devisees, a fiduciary, and practically a trustee in many respects, subject to the burden of dealing with a fairness which is the settled concomitant of such relationship, * * *
   "Thus the personal representative of a decedent occupies a dual position; he stands in a fiduciary relationship to the creditors and heirs of the deceased, and at the same time he has obligations as an officer of the court which appointed him."
   See in re Blodgett's Estate, 93 Utah 1, 70 P.2d 742, 749. "Crosby was also the administrator or manager of the estate in Utah. As administrator he had the duty to make full disclosure of all matters and information regarding the estate. It is not unlike a partnership where one part-

Courts have traditionally accepted their opinion as worthy of serious consideration and at times even prima facie correct.

The litigants and the public should be encouraged to trust that the representations made by court fiduciaries are truthful, and sufficiently competent as not to be instruments in misleading, but such a policy is not promoted if what appears to be an example of less-than-frankness on the part of court fiduciaries goes unchecked. In this case the position taken by Lucy as a court fiduciary in dealing with Vera's claim is hardly consistent with her position taken in the tax matter. In the earlier dispute her pleadings, deposition, and position taken at the pretrial added together, after an appraisal, cannot be other than *Doctor Callister did not make these gifts to hinder or defeat Vera's alimony recovery*. Her position before the tax authorities is clearly *Doctor Callister's motive in making these gifts was to hinder or prevent Vera from reaching this property*. Lucy's counsel, in argument before this court and in briefs submitted, attempt to explain away the inconsistency by suggesting that Lucy does not actually know what Doctor Callister's real intention was, but she had to take a position on each matter, that while the Doctor said to Lucy what Lucy's affidavit showed, Lucy does not necessarily believe this is true because the Doctor was emotionally aroused when he said it. This may be true, but it also may be a half truth, for her to answer a question such as was put to her in the deposition as she answered it without mention of the fact that she had heard the Doctor say what his intent was. It looks even more like an untruth, or a misleading part-truth, when shortly after she files a serious sworn statement, hoping the tax authorities will trust in it, that the Doctor had made his intent known to her, without mentioning that she may not take the Doctor's statement seriously because the Doctor was upset emotionally at the time. Both statements happen to accrue to her personal benefit. Can a court reasonably conclude that this court's fiduciary has been deliberately less than frank and the suspicions and distrust of those in the public who know of the events are aroused? We believe he can.[4]

The appellant here contended that if the circumstances suggest to the court that a court's fiduciary has faltered, the court should not be permitted to act at once as the court has done here, but must first extend to the court's fiduciary a hearing, as there may be an explanation not occurring to the court. In many cases, no

4. In re Sullivan's Estate, 51 Ariz. 483, 78 P.2d 132.

ner manages the business. He must make full disclosure of his acts and the state of the business and render a correct accounting."

doubt, this would be proper. Does a court necessarily have to hold a trial, grant a hearing and take evidence, when the fiduciary's explanation would have to, of necessity, explain away one or the other of two sworn statements, each designed to entice others to act on it against their interest? Can the court summarily estop a court official from explaining here? The only explanation inferred in the proceeding before us is that Lucy was uncertain as to what the fact is as to the Doctor's intent. In some cases it is proper to act without holding further hearings, as when there can be no believable explanation (as when a court punishes for a contempt in his presence or unmistakable misconduct, or when the court views a court fiduciary acting inconsistently, except in self-interest in a matter where the explanation, if true, does not excuse the conduct). Here the court, after due consideration and action with proper discretion, concluded that there is no real chance of a satisfactory explanation. The court, if it is to be respected must act with dispatch.[5]

Lucy's counsel here pleads that Lucy had no obligation to disclose to Vera what she heard from her husband. This may be true if Lucy had not been a fiduciary, but even if the statement of Doctor Callister to Lucy be privilege, or if their dealings be at "arm's length" the privilege would be to remain silent.

Lucy's counsel further contended that Vera cannot complain because Vera was never misled by Lucy. They allege that Vera never believed or relied on Lucy's apparent denial that Doctor Callister intended to hinder or defeat her alimony collection. This is not the question on which the court below ruled. The court ruled that as a fiduciary the executrix was bound to make a fair disclosure to the creditors of all facts known to the fiduciary and to seriously attempt to bring assets into the estate to pay the creditors.[6] Had Lucy not undertaken to act as a fiduciary, counsel's position might have more weight. Here Lucy undertook to act as a fiduciary and is held to that standard first. Vera had a legal right to Lucy's information,[7] which apparently she did not get. The question is therefor turned and becomes: might Vera have acted differently had she had the information later disclosed in Lucy's affidavit. Undoubtedly she likely would have valued her claim quite differently.

Lucy here contends that Vera is in no position to complain. She contends the affidavit filed with the tax authorities grew from the carefully planted seeds of thought contained in Vera's counsel's letter. (See

5. See Haner v. Haner, 13 Utah 2d 299, 373 P.2d 577–579.
6. See 33 C.J.S. Executors and Administrators § 142, Note 41, p. 1101.

7. See Burns v. Skogstad, 69 Idaho 227, 206 P.2d 765, 769.

note 1) Does this letter suggest a settlement to perhaps promote the misleading of the tax authorities? Is Vera the culprit and Lucy the misled? The letter is unquestionably capable of such an interpretation, but it is also capable of being interpreted as a plea for Lucy to abandon an erroneous position for her own good. The court below has not finally ruled on the suggestion that Vera's "hands are unclean" and should not have the aid of the court. This issue may well yet be tried. But regardless of the determination of that matter, it does not indicate the court below erred in rejecting Lucy's conduct as unworthy of approval, and not desired in the public interest. After the court below determines the facts in dispute, such as an intent of the Doctor, the good faith of Vera's counsel in writing the letter, and other contests that may develop, then justice and equity will be dealt between them.

This court recognizes the desirability of holding parties to stipulations soberly reached, and judgments entered thereon. It is only through use of guarded discretion should a court permit an exception to this general policy; however, the court must be also allowed reasonable latitude in supervising its officers. All facts considered, we see no abuse of discretion here.[8] Costs to the respondent.

HENRIOD, C. J., McDONOUGH and WADE, JJ., and CHARLES G. COWLEY, District Judge, concur.

CALLISTER and CROCKETT, JJ., having disqualified themselves, did not participate herein.

8. See Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1, quoted in 2 Scott on Trusts, 1939, ed., p. 909. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus had the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."